No. 23,812.

The State of Kansas, *Appellee,* v. William F. Patterson, *Appellant.*

SYLLABUS BY THE COURT.

1. Criminal Law—*Cross-examination of Defendant as to His Past Life and Conduct Admissible.* Among the numerous exceptions to the rule that it is not competent to show that a defendant committed one offense in proof that he committed another, is that when a defendant takes the stand in his own behalf as a witness "he is subject to the same tests as other witnesses, and for the purpose of impairing his credibility he may be cross-examined as to his past life and conduct and as to any specific facts tending to disgrace or degrade him, although they are irrelevant to the commission of the offense charged." (*The State v. Bowers,* 108 Kan. 161, 165, 194 Pac. 650.)

2. Same—*Statutory Rape—Cross-examination of Defendant—Judicial Discretion.* In a prosecution charging statutory rape, it is held there was no abuse of the court's discretion in permitting a cross-examination of the defendant with respect to false statements made by him in an application for a license to marry the sister of the prosecuting witness.

3. Same—*Charges of Improper Relations of Prosecutrix with Other Persons— Proper Rebuttal Testimony.* At the close of the defendant's testimony the state called six of the twenty-five persons mentioned in the course of the trial as having had improper relations with the prosecuting witness, and each denied that anything improper had ever occurred between them. The ground of the objection was that defendant had never said that these persons had such relations with the prosecuting witness but that she had admitted the fact to him at different times. *Held,* upon the facts stated in the opinion, the defendant made the rebuttal evidence competent by imputations against the character and reputation of the prosecuting witness and by charges that she had been guilty of criminal relations with these and other persons; and further *held,* that the court exercised a proper discretion in admitting the rebuttal testimony.

4. Same—*Proper Instruction.* *Held,* on the facts stated, that the question whether the complaining witness was guilty of improper relations with other persons became an issue and justified an instruction that even if the jury believed that she had been guilty of such misconduct with others, that fact would not make the defendant the less guilty if he actually committed the crime charged against him.

5. Same—*Evidence Relating to Defendant's Reputation.* On the facts stated it is held that there was no prejudicial error shown by striking out a part of the testimony of a witness called to testify to the defendant's reputation who stated that he had never heard his reputation questioned (the record failing to disclose whether any part of the testimony of the witness was permitted to stand, or whether he stated his opinion of what the defendant's reputation was).

The State v. Patterson.

6. SAME—*Instructions.* Instructions in reference to the effect of evidence concerning the good reputation and character of the defendant as a peaceable, law-abiding citizen considered, and held to be proper.

7. SAME. Instructions to the effect that defendant had introduced evidence in reference to his character as a peaceable, law-abiding citizen and how such evidence was to be considered by the jury, held to be unobjectionable, and *held further*, that it was not error to refuse an instruction that such evidence should be considered not only as a good defense but where the defendant has testified it stands as a recommendation that he will speak the truth.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Oponion filed November 4, 1922. Affirmed.

*J. J. Schenck,* and *W. E. Atchison,* both of Topeka, for the appellant.

*Richard J. Hopkins,* attorney-general, *Tinkham Veale,* county attorney, and *Ralph H. Gaw,* assistant county attorney, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The defendant, William F. Patterson, was convicted of the charge of having sexual intercourse with Helen McVey, a girl under eighteen years of age. He appeals.

The evidence took a wide range and the trial occupied a week. A summary of what was shown by the evidence, including a large portion of the sordid details related by the witnesses, follows:

The defendant, a civil-war pensioner, is past seventy-six years of age and owns a home in which he lives in North Topeka. About twelve years ago he became acquainted with Mary McVey and her family, who at that time lived in the same part of the city, but at some distance from him. He was a widower with married children who resided elsewhere. Mary McVey's husband had died two years before and had left three small children, Dollie, Helen, and a son, Willie. She had difficulty in earning a living for her family. At that time Patterson sold vegetables and produce from a truck, and he often made gifts of provisions to Mrs. McVey, and became a frequent visitor at the house. It is admitted by both that their acquaintance soon developed into an illicit relationship, which she claims was upon a promise of marriage. This continued for several years. During her severe illness, resulting from an abortion or miscarriage, the defendant spent most of his nights at the McVey home assisting in the care of Mrs. McVey. At that time Dollie was about sixteen years old and Helen about thirteen; they slept in the same bed. Patterson frequently occupied the bed with them, and about that time began to have sexual intercourse with Helen, which prac-

The State v. Patterson.

tice continued at frequent intervals until shortly before this prosecution was instituted. He had also established the same relations with Dollie McVey.

Five or six years ago the defendant persuaded Mrs. McVey to purchase a home next door to him on Van Buren street in North Topeka, and he furnished her financial assistance in securing the property, taking the title in his name. She made payments to him from time to time as she could. The defendant admits that from the time the family became next-door neighbors he became almost a member of the family and usually passed his evenings there. He exercised or attempted to exercise control over the children, and especially over the conduct of Helen McVey. Her testimony is that she continued to submit to his illicit relations from fear of his threats of exposing her and sending her to the girls' school at Beloit. Mrs. McVey suspected the relations between the defendant and Helen and spoke to Helen about it; and Helen asked the question, "What about yourself?" She made no denial to the daughter of her own relations with him but told Helen to keep away from defendant's house, and she protested about the matter to the defendant. She says he told her that it was none of her business, dared her to "open her head" about it, and made a number of threats. He was angered because of her interference and served notice upon her to leave the home where she lived; but the quarrel was patched up for a time. Mrs. McVey testified that she dreaded an exposure of the conditions that had existed, and for that reason tried to keep the matter quiet.

Whether the defendant became a mental pervert possessed with a mania for continually talking with these girls and others about sexual matters, or, as suggested by counsel for the state, he was attempting to destroy the reputation of Helen McVey in preparation for a defense of his own criminal acts; at all events, he kept accusing her of having illicit relations with boys and young men, some of them schoolmates of hers, and others, older men with whom he had seen her talking. He charged her with being criminally intimate with the janitor of the school where she attended; and in the presence of the rest of the family, accused her and her brother, William, with having sexual intercourse. The defendant testified that she admitted all of these charges to him at different times. She said that he was constantly insisting that she was guilty of such conduct with other persons as well as with her brother, and that she would deny

it, but he would keep accusing her and that she would say "yes" in order to keep him still. "He would ask about one, and get tired talking about him and start talking about someone else." A physician who made an examination testified that Helen had had sexual intercourse with some person.

The evidence of the state shows that defendant was the author of anonymous letters received by the principal of the school where Helen attended, charging that Anderson, the janitor, was guilty of misconduct with Helen and with other girls attending school. The principal testified that he was called to the 'phone by someone and the same charge made, but the person refused to state his name. The proprietor of a store from which the message was sent testified he heard the defendant telephone the charges to the principal.

After this prosecution was begun and written statements had been taken in the county attorney's office from Dollie McVey, Helen McVey and their brother, the defendant took Dollie McVey to Lawrence, where they were married. In the application for the license Patterson gave his name as William F. Peterson and stated that he was a resident of Belpre, Kan., that he was fifty years of age and that the name of the girl was May D. McVey; that she was a resident of Belpre, Kan., and was twenty years of age. The marriage did not become known to the family until a week after it occurred, when Dollie took her personal belongings and moved to defendant's house. After her marriage she turned against her own family. She was called as a witness for the state, but upon defendant's objection she was not permitted to testify.

The first complaint of error relates to the admission of evidence of the marriage of defendant and Dollie McVey. He was asked why he didn't get married under the proper names of himself and Dollie McVey. He answered that it wasn't his mistake "when they made the name wrong." He first denied that he had made any misstatement in the application for the license, but when confronted with the original license from the probate court of Douglas county he admitted that he had made three false statements under oath with respect to his name, age and residence. Over defendant's objections the state was permitted to introduce in evidence the original application. It is insisted this was error; that evidence to show that a defendant committed one offense is not competent to prove another and distinct offense; and further, that the state was bound by his first answer to the question and could not offer evidence in rebuttal

thereof. There are many exceptions to the rule relied upon forbidding evidence in a criminal case to show that the accused has committed another distinct offense. (*The State v. Allen*, 98 Kan. 778, 160 Pac. 795; *The State v. Bowers*, 108 Kan. 161, 194 Pac. 650.) In the opinion in the latter case it was said:

"It has been held that when a defendant takes the stand and assumes the character of a witness he is subject to the same tests as other witnesses, and for the purpose of impairing his credibility he may be cross-examined as to his past life and conduct and as to any specific facts tending to disgrace or degrade him, although they are irrelevant to the commission of the offense charged." (p. 165.)

To the same effect see *The State v. Pfefferle*, 36 Kan. 90, 12 Pac. 406; *The State v. Probasco*, 46 Kan. 310, 26 Pac. 749; *The State v. Ross*, 77 Kan. 341, 94 Pac. 270. After the defendant had admitted swearing to false statements in his application for a license he could hardly have been prejudiced by the introduction of the original application. We think there was no abuse of the court's discretion in the admission of the evidence.

At the close of defendant's evidence, the state called six of the twenty-five persons mentioned in the course of the trial as having had improper relations with Helen McVey, and over objections, they were asked with respect to the truth of the charges. Each denied that anything improper had ever occurred between himself and Helen McVey. The ground of the objection was that defendant never had said that the persons who testified had had intercourse with Helen McVey; that "she said it herself." It was insisted that there was no evidence offered that any of these witnesses had ever been intimate with her, save and except her own admissions. In passing upon the objection the court made the statement that Helen McVey while on the witness stand denied the charges and had never admitted that the charges were true, to which counsel replied: "But she admitted she told Mr. Patterson. The Court: She claimed it was under some pressure."

It is argued that the evidence was not competent for any purpose; that if the defendant had testified that Helen McVey had been criminally intimate with these persons, their evidence might have been competent in rebuttal to show that defendant was mistaken or had testified falsely. But it is insisted that the only matter in issue was whether Helen McVey had made a statement to the defendant admitting the facts and not whether her admission was

true. Conceding the correctness of the rule for which defendant contends, two things must be established before we would be justified in reversing the judgment and ordering a new trial. The defendant must bring himself within the rule; and if successful in that, it must appear that the admission of the rebuttal testimony was prejudicial.

The state contends that the defendant made the testimony competent by imputations against the character of Helen McVey throughout the whole trial and by direct charges that she had been guilty of criminal relations with these persons. Attention is called to the fact that in his cross-examination, defendant was asked: "Q. At least twenty-five boys you claimed she was having these relations with? A. Something like that," and also to the fact that in his opening statement to the jury defendant's counsel made this statement:

"Things went all right with these people until about three years ago. At that time Mr. Patterson learned that Helen, the youngest daughter, was carrying on in a way that a child should not do. He learned, and he learned it to be an absolute fact, that this girl, Helen, was being debauched by her own brother, Willie, who sits beside her at this moment. . . . At the same time he was investigating this matter he learned that she was having sexual relations with several other young men and some who were older . . . the evidence will show that these relations continued between Willie and Helen since this little girl was twelve or thirteen years old."

The state proved by a number of witnesses and by defendant himself that he had been systematically making these charges to other people, including the principal of the school where the girl attended. Helen testified that he was constantly accusing her of such conduct with the persons who testified in rebuttal as well as with many others. As suggested in the brief of the state, the defendant came into court prepared to testify to the names of twenty-five men and boys with whom he claimed this girl had held illicit relations.

We think that the defendant has not succeeded in bringing himself within the protection of the rule he now invokes to sustain his claim that error was committed in permitting the admission of the rebuttal testimony. Moreover, upon the bare question of whether or not Helen had made the statements to which the defendant testified there was no dispute; she admitted that she made the statements. She explained them. Her explanation was that he was constantly nagging her with these charges; that in order to quiet

him she made the admissions. It is suggested that if the defendant was not claiming that Helen was guilty of these offenses, what possible harm could there be in the state calling witnesses to testify in rebuttal to the fact of her innocence of any wrongful conduct with the parties testifying?

It would seem that the defendant was willing to get the benefit· of the imputations he cast against the character and reputation of the little girl whom he had debauched, but wanted to deprive her and the state from offering evidence to rebut the imputations, upon the technical ground that he had not testified to positive knowledge that the charges were true.

In our opinion, the trial court exercised proper discretion in admitting the rebuttal evidence.

The defendant introduced in support of a motion for a new trial the affidavits of six of the jurors to the effect that this rebuttal testimony influenced them in arriving at their verdict. The affidavits, of ·course, cannot be considered for any purpose, as it is not competent for a juror to impeach his verdict in that manner.

We think the question respecting the relations of Helen McVey with other persons became an issue in the case, and that it was proper for the court in the instructions to refer to it and to tell the jury that even if they believed that she had been guilty of misconduct with other persons, that fact would not make the defendant the less guilty, if he actually committed the offense charged against him.

A witness called by defendant to testify as to his reputation stated that he had known defendant nine or ten years and was well acquainted with him, and had never heard his reputation questioned nor heard anything against him until this case came up. The court sustained a motion to strike out the answer. It is true, that the absence of unfavorable comment of a person is regarded as sufficient basis for predicating the general opinion of him as favorable. (2 Wigmore on Evidence, § 1614.) And the fact that a person is not talked about at all is often the best evidence of his character. (Id.) But the record does not disclose whether any part of the testimony of this witness was permitted to stand; nor whether, after he qualified himself as a witness, he was asked to state what the defendant's reputation was. Other witnesses testified that his reputation in these respects was good. In the case cited by defendant (*The State v. McClellan,* 79 Kan. 11, 98 Pac. 209), the witness testified in chief

that he was acquainted with the defendant's general reputation for honesty, etc., and that such reputation was good, and stated further, that he did not know that he had ever heard it questioned. The court struck out the entire testimony of the witness, on the ground that it did not tend to establish a general reputation, and this was held to be error. The abstract here is silent as to what the witness had testified respecting the reputation and character of the defendant except as to the negative fact that he had never heard it questioned. Other witnesses appear to have been called, who testified to the good reputation and character of the defendant. We think the usual course of procedure is to have the witness, after qualifying, state what the defendant's reputation is, good or bad; and that if he says it is good, then it would be proper for him to state that he never heard the defendant's reputation questioned or discussed. The record fails to show that error was committed, or if committed, that it was prejudicial.

In the instructions the court referred to the fact that the defendant had introduced evidence of his good reputation and character as a peaceable and law-abiding citizen; that this evidence was to be considered in connection with other evidence in determining his guilt; and if from the whole evidence, including that relating to reputation, the jury retained a reasonable doubt, he was to be acquitted.

In another the court charged that evidence of previous good character goes to meet every charge against the defendant and should be used in considering their verdict. This was sufficient; and it was not error for the court to refuse to give an instruction that such evidence should be admitted and considered not only as a defense, but that where the defendant has testified in his own behalf, it stands as a recommendation that he will speak the truth.

Failing to discover any errors in the record, the judgment is affirmed.